# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NORTHEASTERN DIVISION

| | |
|---|---|
| **RONALD L. JESTES, JR.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **No. 2:11-00059** |
| ) | **Judge Sharp** |
| **SAXON MORTGAGE SERVICES, INC.** ) | |
| **and OCWEN LOAN SERVICING, LLC,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM

In this action arising out of the handling of Plaintiff Ronald L. Jestes Jr.'s mortgage, both

Defendants have filed Motions for Summary Judgment. (Docket Nos. 69 & 73). Those Motions

have been fully briefed by the parties. (Docket Nos. 70, 85, 88, 91-1, 94 & 96). For the reasons that

follow, summary judgment will be granted in part and denied in part.

## I. FACTUAL BACKGROUND

On August 22, 2005, Plaintiff Ronald L. Jestes, Jr. executed a Note in the amount of

$180,000 in favor of Taylor, Bean and Whitaker Mortgage Company. The Note was secured by a

Deed of Trust covering Plaintiff's residence at 417 Charleston Drive in Cookeville, Tennessee.

Plaintiff first defaulted on the Note and Deed of Trust in January 2009.

On August 12, 2009, Saxon became the servicer of the loan. Two days later, Saxon sent

Plaintiff a "Notice Regarding Real Estate Settlement Procedures Act (RESPA)" which provided that

all qualified written requests be mailed or faxed to: Saxon, Attn: Customer Relations, P.O. Box

163405, Fort Worth, Texas 76161, or Attn: Customer Relations, 817-665-7970 (fax). Saxon also

claims that, approximately one week later, it sent Plaintiff a debt validation letter.

1

Plaintiff entered into a Home Affordable Modification Program ("HAMP") Trial Period Plan on October 1, 2009, that required Plaintiff to make payments in the amount of amount of $1,188.35. Under the terms of the trial plan, the lender was not required to offer a permanent modification if the borrower did not meet all of the requirements, including submitting necessary income documentation. Further, the lender was authorized to report the loan as delinquent during the term of the plan.

Saxon, in accordance with its own underwriting policies and Freddie Mac directives, sought to verify Plaintiff's income before offering a permanent modification. Because Plaintiff was self-employed, Saxon sought his most recent profit and loss statements. According to its call records, Saxon requested tax documents from Plaintiff on October 27, 2009, October 30, 2009, November 12, 2009, November 16, 2009, January 26, 2010, March 8, 2010, and April 12, 2010. Saxon sent a letter dated December 30, 2009, indicating that Plaintiff was at risk of losing eligibility for a final modification because of his failure to submit required documentation. Saxon also sent a letter dated April 15, 2010, stating that it had tried to contact Plaintiff regarding missing documents and requesting that Plaintiff fax a copy of his signed 2008 tax returns and his most recent pay stubs.

Plaintiff does not dispute that he received phone calls and letters about documentation to support a permanent modification of his loan. He claims, however, that he complied with Saxon's requests.

By letter dated April 30, 2010, Saxon informed Plaintiff that it was unable to provide a HAMP agreement because of missing documentation. In a letter dated December 17, 2010, Plaintiff was informed that his loan was removed from the HAMP program on April 29, 2010, because Saxon did not receive all of the required payments.

Plaintiff's last payment on the loan account was in May 2010. Plaintiff was sent notices of default requesting payment of the overdue amounts on June 8, 2010 and December 27, 2010. Plaintiff did not cure the default.

In November 2010, Plaintiff was considered for and offered an alternative modification. However, Plaintiff declined the offer because he could not afford the payments.

In February 2011, Plaintiff's account was referred to foreclosure. For accounts that are more than 90 days past due, Saxon policies require a minimum of one attempt to call a customer's home or work phone each weekday, and at least one attempt to dial a home telephone number during the weekend. The dialing activity may occur either by agent, or by virtual or outbound interactive voice response applications. Saxon employs software to reduce the number of unnecessary calls.

In its moving papers, Saxon asserts that its call records show the following:

•December 20, 2010, four phone calls, none of which resulted in contact;

•February 11, 2011, four phone calls, one of which resulted in contact during which Plaintiff requested workout information;

•February 12, 2011, three phone calls, one of which resulted in contact during which the parties discussed options to avoid foreclosure;

•March 7, 2011, four phone calls, two of which resulted in contact during which Plaintiff stated he wanted to stay in his residence, discussed the previous modification offer, suggested that he may file for bankruptcy or seek to enjoin foreclosure and noted that the customer service representative was "polite"; and

•April 22, 2011, a call during which Plaintiff expressed a desire to stay in the residence.

(Docket No. 75 ¶¶ 39-51).

Plaintiff has produced a phone log which suggests far more than a handful of calls made between December 20, 2010 and April 22, 2011. According to the Court's review based on the log,

Plaintiff received more than 50 calls from Saxon during that period. Many of those calls were for one minute (and may suggest no contact), but many were of much longer length. Further, during that same period, Plaintiff made more than 20 calls to Saxon.

Regardless of the number of calls, the parties agree that all were made between 8:00 a.m. and 9:00 p.m. It also appears that there is no evidence to suggest that Saxon representatives used profanity or vulgar language, or made any threats during telephone conversations with Plaintiff, although in his deposition he claimed that representatives sometimes raised their voices.

Saxon received a written no-contact request from Plaintiff and within three days thereafter placed a "no contact" on the account on April 26, 2011. Saxon placed no phone calls to Plaintiff thereafter. However, both before and after the no-contact request, Saxon made monthly visits between March and June 2011 to inspect the upkeep of the property.

Saxon began reporting Plaintiff's loan account as delinquent since November 2009. It has been reporting the account as in foreclosure since February 2011.

Ultimately, the loan was transferred to Ocwen for loan servicing. Up until the time of transfer, Saxon was in possession of the Note endorsed in blank or was in possession the Note endorsed to the order of Saxon. When the servicing was transferred to Ocwen, Saxon endorsed the Note to the order of "Ocwen Loan Servicing, LLC" and transferred possession to Ocwen.

On February 2, 2012, Shapiro and Kirsch, LLP, a law firm, sent Plaintiff a letter containing information regarding alternatives to foreclosure. The letter indicated that it was sent in relation to the loan being serviced by Ocwen.

Based upon the foregoing, Plaintiff filed a Complaint in this Court against Saxon asserting claims for violations of RESPA, the Fair Debt Collection Practices Act ("FDCPA"), the Tennessee

Consumer Protection Act ("TCPA"), and negligence in the servicing of Plaintiff's residential mortgage loan. Plaintiff's First Amended Complaint added Ocwen as a Defendant, alleging violations of RESPA and the FDCPA against it.

## II. SAXON'S MOTION FOR SUMMARY JUDGMENT

Saxon moves for summary judgment on all of Plaintiff's claims. The Court considers the arguments in the order presented by the parties.

### A. Saxon's Entitlement to Enforce the Note and Deed of Trust During Servicing

Plaintiff alleges that the endorsement to the order of Saxon was improper and void because Freddie Mac is the owner/holder of the Note. He argues:

> The Note was first originated by Taylor, Bean & Whitaker (TBW) then subsequently conveyed to Freddie Mac who has specific requirements that the Note be provided to them with an endorsement in blank and not to be further endorsed. Saxon later placed an endorsement on the Note but there is no evidence that Saxon gave valid consideration to become the owner and holder of the Note. Saxon should never have placed an endorsement on the Note as this act was inconsistent with FreddieMac guidelines. Thus, it would seem that either FreddieMac or Saxon or some other entity could have sought to enforce the Note which would give the effect of trying to enforce the Note twice.

(Docket No. 91-1 at 5, footnote omitted).

Plaintiff cites no authority for the proposition that Saxon's endorsement of the Note which purportedly violates Freddie Mac guidelines makes the note void and without force and effect. "Promissory notes secured by deeds of trust are generally considered negotiable instruments governed by Article 3 of the Uniform Commercial Code." Dickerson v. Regions Bank, 2014 WL 1118076, at *8 (Tenn. Ct. App. Mar. 17, 2014). Under Article 3 of the UCC and Tennessee's codification thereof, a "negotiable instrument"

> (a) . . . means an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges described in the promise or order, if it:

> (1) Is payable to bearer or to order at the time it is issued or first comes into possession of a holder;
>
> (2) Is payable on demand or at a definite time; and
>
> (3) Does not state any other undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment of money, but the promise or order may contain (i) an undertaking or power to give, maintain, or protect collateral to secure payment, (ii) an authorization or power to the holder to confess judgment or realize on or dispose of collateral, or (iii) a waiver of the benefit of any law intended for the advantage or protection of an obligor.

Tenn. Code Ann. § 47–3–106. The Note Plaintiff signed with Taylor, Bean and Whitaker had all of the hallmarks of a negotiable instrument, and Plaintiff does not argue otherwise.

"Foreclosure in Tennessee is not required to be performed by the 'actual creditor,' . . . but may be performed by the holder of the instrument." Amour v. Bank of Am., N.A., 2013 WL 6497821, at *2 (E.D. Tenn. Dec.10, 2013) (citing Tenn. Code Ann. § 47-1-201). "A holder of an instrument is a person or entity '[i]n possession of a negotiable instrument that is payable either to bearer or to an identified person that is the person in possession.'" Id. (quoting Tenn. Code Ann. § 47–1–201) see also Dauenhauer v. Bank of New York Mellon, 2013 WL 2359602, at *6 (M.D. Tenn. January 16, 2013) ("In Tennessee, a promissory note is a negotiable instrument . . . and thus may be transferred to another party who receives the right to enforce the instrument"). "'Moreover, under Tennessee law, [a] Deed of Trust need not be separately assigned so that the holder may enforce the note; as goes the note, so goes the Deed of Trust.'" Deutsche Bank Nat'l Trust Co. v. Tibbs, 2014 WL 280365, at *5 (M.D. Tenn. Jan. 24, 2014) (quoting Hixson v. Wilson and Assoc., PLLC, 2013 WL 6147826, at *2 (E.D. Tenn. Nov. 22, 2013)). During the period Saxon had contact with Plaintiff it was the party entitled to enforce the Note and Deed of Trust because it was in

possession of the Note endorsed in blank and/or in possession of the Note addressed to the order of Saxon.

Additionally, Plaintiff is not in a position to challenge the validity of the assignment of the Note. The Sixth Circuit has stated that "there is ample authority to support the proposition that 'a litigant who is not a party to an assignment lacks standing to challenge that assignment.'" <u>Livonia Prop. Holdings, LLC v. 12840-12976 Farmington Road Holdings, LLC</u>, 339 F. App'x 97, 102 (6th Cir. 2010) (citation omitted). "The exception to this rule is if a plaintiff asserts a 'genuine claim' that he might be subject to 'double liability on the debt.'" <u>Brown v. Federal Nat'l Mortg. Ass'n</u>, 2013 WL 4500569, at *3 (W.D. Tenn. Aug. 19, 2013) (quoting <u>Livonia</u>, 339 F. App'x at 102). "But if a borrower's rights and duties remain the same but the only change is to whom those duties are owed, the borrower 'cannot now step into the shoes of an assignor to assert its contract rights.'" <u>Id</u>. (quoting, <u>Livonia Prop. Holdings, LLC v. 12840–12976 Farmington Rd. Holdings, LLC</u>, 717 F. Supp. 2d 724, 737 (E.D.Mich. 2010)).

Here, Plaintiff has not shown that he is or will be subject to pay the debt twice. When he defaulted on his obligations, Saxon, as the holder of the Note, was entitled to seek appropriate remedies. Summary judgment is warranted insofar as Plaintiff claims Saxon was not entitled to enforce the Note and Deed of Trust.

## B. <u>RESPA Claim</u>

The purposes underlying RESPA

> are very similar to those of the Truth in Lending Act. Congress's intent was to insure that consumers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices that have developed in some areas of the country.'"

Marias v. Chase Home Finan. LLC, 736 F.3d 711, 719 (6th Cir. 2013) (quoting Vega v. First Fed. Sav. & Loan Ass'n of Detroit, 622 F.2d 918, 923 (6th Cir. 1980)).  Its scope includes not only the "negotiation and execution of mortgage contracts," but also "loan servicing."  Id.

Under RESPA, "[i]f any servicer of a federally related mortgage loan receives a qualified written request ["QWR"] from the borrower (or an agent of the borrower) for information relating to the servicing of such loan, the servicer shall provide a written response acknowledging receipt of the correspondence within 5 days (excluding legal public holidays, Saturdays, and Sundays) unless the action requested is taken within such period." 12 U.S.C. § 2605(e)(1)(A).  "To constitute a QWR, the correspondence from the borrower must enable the servicer to identify the name and account of the borrower, include a statement of the reasons for the borrower's belief that the account is in error, or provide sufficient detail to the servicer regarding other information sought by the borrower."  Williams v. Wells Fargo Bank, N.A., 2014 WL 1044304, at *7 (5th Cir. Mar. 19, 2014) (quoting 12 U.S.C. § 2605(e)(1)(B)).  "Within thirty days of receipt of a QWR the servicer must either make appropriate corrections to the borrower's account or, after investigation, provide a written explanation including a statement of reasons the servicer believes the account is correct or any other information requested by the borrower." Id. (quoting 12 U.S.C. § 2605(e)(2)).  Thus, to state a viable claim under RESPA, a plaintiff must show that he sent a correspondence which met the requirements of a QWR, that the servicer failed to timely respond, and that this failure caused plaintiff actual damages. Williams, 2014 WL 1044304, at *7.

Plaintiff's RESPA claim is based upon a March 9, 2010 letter from the Tennessee Department of Financial Institution, a June 23, 2010 letter from American Residential Law Group, and an email allegedly sent by Plaintiff to Saxon on August 11, 2010, but which has not been

produced by Plaintiff.  Defendant argues that none of these are proper QWRs because they were not sent to the address or facsimile number specifically designated by Saxon, the QWRs do not request information required to be responded to under RESPA, and Plaintiff has shown no actual damages which arose from any alleged RESPA violations.  Because the Court agrees with the first two arguments, it need not reach the third.

In <u>Berneike v. CitiMortgage, Inc.</u>, 708 F.3d 1141 (10th Cir. 2013), the United States Court of Appeals for the Tenth Circuit addressed the issue of whether letters sent to an address other than that designated by the servicer triggered the servicer's response duties under RESPA.  Noting that "a servicer's authority to designate an address for receipt of QWRs is not directly addressed by RESPA," and that the "legislative history does little to inform the issue," the court gave "controlling weight" to Regulation X which had been properly promulgated by the Department of Housing and Urban Development.  <u>Id</u>. at 1147 & 48.  Regulation X, which the court found to be based upon "a permissible construction of RESPA," <u>id</u>. at 1148, provides that "a servicer may establish a separate and exclusive office and address for the receipt and handling of qualified written requests" by "notice either included in the Notice of Transfer or separately delivered by first-class mail, postage prepaid," 24 C.F.R. § 3500.21(e)(1).

The <u>Berneike</u> court concluded that "[f]ailure to send the QWR to the designated address 'for receipt and handling of [QWRs]' does not trigger the servicer's duties under RESPA" because "RESPA and its implementing regulation envisioned that only certain communications would trigger liability for damages under § 2605, and delineated certain requirements for communications before imposing that liability." <u>Id</u>. at 1149.  "Communication failing to meet the requirements of RESPA and its implementing regulation amounts to nothing more than general correspondence between a

borrower and servicer." Id. This is so even if the servicer responded to earlier requests without apprising the mortgagor that the correspondence was sent to the wrong address. Id.

Both before and after Berneike, district courts have also reached the conclusion that the response obligation under RESPA is only triggered when the QWR is sent to the designated address. See e.g., Roth v. CitiMortgage, Inc., 2013 WL 5205775 (E.D.N.Y. Sept, 11, 2013) ("plaintiff's letters sent to addresses other than those designated, did not trigger defendant's acknowledgment and response obligation under RESPA"); Stein v. Nat'l City Bank, 2010 WL 5559528, at *8 (D. Minn. Nov. 22, 2010) ("If a borrower does not send the qualified written request to the proper address, he cannot create a triable issue of material fact that the servicer's RESPA obligations were triggered."); Steele v. Green Tree Serv., LLC, 2010 WL 3565415, at *3 (N.D. Tex. Sept. 7, 2010)( "The court holds that [the lender] never received a qualified written request because the [plaintiff's] letters were not sent to the exclusive address that [the lender] specified); Bally v. Homeside Lending, Inc., 2005 WL 2250856, at *3 (N.D. Ill. Sept. 8, 2005) (summary judgment appropriate on RESPA claim because "even if the letters had been faxed or otherwise received by defendant, plaintiff failed to send her correspondence to the correct address as required by RESPA"). The Court agrees with these authorities.

Plaintiff has not shown that he directed any of the correspondence to "Saxon, Attn: Customer Relations, P.O. Box 163405, Fort Worth, Texas 76161, or Attn: Customer Relations, 817-665-7970 (fax)" as required by Saxon's August 14, 2009 "Notice Regarding Real Estate Settlement Procedures Act." Instead, the letter from the Tennessee Department of Finance was sent to "Judy Duffek, Saxon Mortgage, Inc. 4718 Mercantile Drive, N., Fort Worth Texas 76137"; the letter from American Residential Law Group contains no indication of where it was sent, other than to "Saxon Mortgage,"

and the purported e-mail, by definition, could not have been sent to a brick and mortar address or a facsimile number.

Morever, the two letters that are in the record do not constitute requests that Saxon was bound to respond to under RESPA. The first letter from the Tennessee Department of Finance concerned a complaint made to the Department by Plaintiff. Assuming that the letter's request for "a loan transaction history" and "all loan modification agreements" (Docket No. 73-12), is a proper QWRs, there is no showing that the Department was acting as Plaintiff's agent, yet RESPA requires that QWRs be received "from the borrower (or an agent of the borrower)." 12 U.S.C. § 2605(e)(1)(A). Moreover, the record reflects that on April 15, 2010, within 60 days of receipt, Saxon responded to the Department's complaint by sending Plaintiff a copy of the loan modification agreement and his payment history, and directing him to the Saxon website to "obtain loan information, billing statements, escrow information, copies of loan documents, etc." (Docket No. 73-14 at 2).

Similarly, Plaintiff has not established that he authorized American Law Residential Group to obtain information about his account, or that Saxon was aware of any such authorization. Regardless, the request for the "Original Truth-in-Lending" statement, the "Original HUD Statement," the "original Mortgage Note," and "Original Disclosure Documents (all)" (Docket No. 73-20 at 3) are not proper QWRs under RESPA.

"In determining whether a given request constitutes a QWR, courts have drawn a distinction between communications related to the servicing of the loan, which are covered under RESPA, and those challenging the validity of a loan, which are not." Minson v. CitiMortgage, Inc., 2013 WL 2383658, at *4 (D. Md. May 29, 2013). Servicing under RESPA

> means receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan, including amounts for escrow accounts . . . , and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan.

12 U.S.C. § 2605(i)(3). Thus, letters that "do not request information related to loan servicing, such as information about the receipt of periodic payments or the amount of such payments" are "not valid QWRs." Richardson v. Rosenberg & Assoc., LLC, 2014 WL 823655, at *8 (D. Md. Feb. 27, 2014). These include requests like those made by American Residential Law Group for original loan documents because they do not relate to loan servicing. See Medrano v. Flagstar Bank, FSB, 704 F.3d 661, 666–67 (9th Cir. 2012) (servicing "does not include the transactions and circumstances surrounding a loan's origination [because] [s]uch events precede the servicer's role in receiving the borrower's payments and making payments to the borrower's creditors."); Minson, 2013 WL 2383658, at *5 (although communication cited RESPA and claimed to be a QWR it was not because it sought copies of loan documents, verification of the identity of the holder in due course of the loan, and proof of the servicer's authority to service the loan); Au v. Rep. State Mortg. Co., 948 F. Supp. 2d 1086, 1104 (D. Hawaii 2013) (letter which among other things asked for loan documents was "not a QWR and [servicer] had no obligation under RESPA" to respond); Barocio v. Bank of Amer.,BA, 2012 WL 3945535, at *7 (N.D. Cal. Sept. 10, 2012) ("[a] request for loan documents, however, is not the proper subject of a QWR"); McGory v. BAC Home Loan Serv., LP, 2011 WL 17435475, at *2-3 (N.D. Ohio 2011) (servicer had no obligation tor respond to purported QWR which requested "all documents pertaining to the origination of [plaintiff's] mortgage, as well as certified copies of the loan documents, allonges, assignment and transfer receipts").

Saxon is entitled to summary judgment on Plaintiff's claims under RESPA.

## C.  FDCPA Claim

Plaintiff alleges Saxon violated the FDCPA for a host of reasons, including that it failed to provide Plaintiff with a Debt Validation Notice letter within five days of initial contact; made multiple telephone calls on certain days and/or at unusual places and times; made telephone calls after Plaintiff requested that communications cease; failed to disclose that it was a debt collector during certain phone calls; and conducted unreasonable property inspections.  As a preliminary matter, Saxon asserts that it is not a debt collector for purposes of the FDCPA and so all of the alleged violations leveled by Plaintiff fail.

Citing Montgomery v. Huntington Bank, 346 F.3d 693, 700 (6th Cir. 2003), Saxon argues that "[u]nder Sixth Circuit law, an enforcer of a security interest falls outside the ambit of the FDCPA for all purposes, except for purposes of § 1692f(6)."  (Docket No. 85 at 22).  Because "Plaintiff asserts that Saxon has violated various provisions of the FDCPA but has not alleged that Saxon violated 15 U.S.C. § 1692f(6)," the argument goes, "Saxon is 'statutorily exempt from liability under the FDCPA.'" (Id. at 23 quoting Scott v. Wells Fargo Home Mort., 326 F. Supp. 2d 709, 718 (E.D. Va. 2003)).

Saxon neglects to consider Bridge v. Ocwen Federal Bank, FSB, 681 F.3d 355 (6th Cir. 2012).  There, after citing Montgomery for the proposition that "the definition of debt collector 'does not include consumer's creditors,'" the Sixth Circuit held that "an entity which acquires a debt and seeks to collect it . . . is either a creditor or a debt collector and its collection activities are covered under the FDCPA accordingly." Id. at 361.  The court continued:

> The distinction between a creditor and a debt collector lies precisely in the language of § 1692a(6)(F)(iii).  For an entity that did not originate the debt in question but acquired it and attempts to collect on it, that entity is either a creditor or a debt collector depending on the default status of the debt at the time it was

> acquired. The same is true of a loan servicer, which can either stand in the shoes of
> a creditor or become a debt collector, depending on whether the debt was assigned
> for servicing before the default or alleged default occurred.

Id. The court then " h[e]ld that the definition of debt collector pursuant to § 1692a(6)(F)(iii) includes any non-originating debt holder that either acquired a debt in default or has treated the debt as if it were in default at the time of acquisition." Id. at 362.

Here, Saxon opens its Memorandum in support of its Motion for Summary Judgment by stating that "[t]his is a loan that has been in default since January 2009," and that Saxon "began servicing the loan on August 12, 1009." (Docket No. 75 at 1). Given this, Plaintiff is not limited to asserting FDCPA claims solely under Section 1692f(6).

Turning to the claims actually pled, Saxon argues that the claim based upon the alleged failure to timely send a debt validation letter fails because the letter was sent on August 21, 2009, and the original Complaint was not filed until June 1, 2011, long after the one year statute of limitations set forth in 15 U.S.C. § 1640k(d). Plaintiff argues that the discovery rule applies to the FDCPA's statute of limitations and that he was unaware of the existence of a debt validation letter until Ocwen produced it in discovery.

The Sixth Circuit has specifically left open the question of whether the discovery rule and/or tolling applies to the FDCPA statute of limitations, Ruth v. Unifund CCR Partners, 604 F.3d 908, 914 (6th Cir. 2010), and the Fifth Circuit has as well. See Serna v. Law Office of Joseph Onwuteaka, P.C., 732 F.3d 440, 446 n.9 (5th Cir. 2013). Both the Fourth and the Ninth Circuit have concluded that the discovery rule applies to FDCPA actions. See Lembach v. Bierman, 528 F. App'x 297, 301 (4th Cir. 2013); Mangum v. Action Collection Serv., Inc., 575 F.3d 935, 940 (9th Cir. 2009). Assuming for the sake of argument that the discovery rule does apply, Plaintiff cannot avail himself

of that rule.

Under the discovery rule, a cause of action does not accrue – and the statute of limitations clock does not begin ticking – until a plaintiff knows, or has reason to know, the factual basis for the cause of action. See Humphreys v. Bank of America, 2014 WL 521169, at *5 (6th Cir. Feb. 11, 2014); John Kohl & Co. P.C. v. Dearborn & Ewing, 977 S.W.2d 528, 532 (Tenn. 1998). "The knowledge component of the discovery rule can be established by evidence showing that the plaintiff actually knew that []he had suffered an injury or if the plaintiff became aware of facts sufficient to put a reasonable person on notice that an injury had been sustained as a result of the defendant's conduct." Aleo v. Weyant, 2013 WL6529571, at *3 (Tenn. Ct. App. Dec. 12, 2013) (citing Carvell v. Bottoms, 900 S.W.2d 23, 29 (Tenn.1995)).

Plaintiff argues that under the discovery rule, "the statute of limitations would accrue until he realized that 'no validation of debt' letter was sent." (Docket No. 91-1 at 16). Actually, the statute of limitations accrued much earlier than that because the FDCPA requires a debt collector to include a notice of the debtor's rights within five days of the initial communication to the debtor. 15 U.S.C. § 1692g(a).

In response to Saxon's statement of fact, Plaintiff concedes that Saxon became the servicer or the loan on August 12, 2009, and that Saxon sent a welcome letter on August 14, 2009. Further, Plaintiff stated in his deposition that his emotional well-being began to deteriorate after Saxon first contacted him in August 2009. While he may not have known that a debt validation letter was required to be sent within five days of initial contact, "[t]he discovery rule cannot be used to toll the statute of limitations because of Plaintiff's claimed lack of knowledge about the law." Williams v. State, 139 S.W.3d 308, 312 -13 (Tenn. Ct. App. 2004); see also Wilson v. Am. Home Assurance

Co., 2014 WL 1318384, at *3 (N.D. Tex. 2014 )(plaintiff's "lack of understanding of the law or misunderstanding as to the availability of a legal cause of action does not support the application of the discovery rule"); Tripo v. Robert Wood Johnson Medical Ctr., 845 F. Supp. 2d 621. 630 (D.N.J. 2012) ("the discovery rule does not toll the accrual date until a claimant knows that he has a legal cause of action against a particular defendant"); King v. Amerigquest Mtg. Co., 2009 WL 3681688, at *2 (D. Md. 2009)("the discovery rule applies to the discovery of facts, not to the discovery of the legal basis for a claim [as] [k]nowledge of the law is presumed").

The remainder of Plaintiff's FDCPA allegations primarily stem from the telephone calls he received and the property inspections that were made. The Court finds that there are genuine issues of fact as to whether those contacts violated the FDCPA generally, and, unlike Saxon, finds it unnecessary to examine each specific subsection of the FDCPA to determine whether Plaintiff is making a claim under the specific subsection and/or whether Plaintiff has presented enough evidence to support a claim under that subsection. That is, the Court will not further parse the record to determine whether, for example, Plaintiff alleges a violation of Section 16925(5), or whether Saxon communicated with Plaintiff at an unusual time or place known to be inconvenient in violation of Section 1692c(1)(1). To the extent that any streamlining is necessary, that is something that can be accomplished in the formulation of jury instructions, after the Court has heard the proof.

In so holding, the Court fully recognizes Saxon's argument that some courts have granted summary judgment where the number of alleged calls has been greater. However, "'[t]here is no bright line rule regarding the number of calls which creates the inference of intent" to annoy or harass, and "[t]he issue ultimately resolves to whether 'the nature of telephone calls, including their frequency, substance, or the place to which they are made, provides grounds to infer a debt

collector's intent to annoy, abuse, or harass without any other evidence of the debt collector's motive in calling.'" Newton v . Porfolia Recovery Assoc., Inc., 2014 WL 340414, at *4 (S.D. Ohio Jan. 30, 2014). That is something the jury must determine in this case. Compare Sanchez v. Client Serv., 520 F. Supp. 2d 1149, 1160 (N.D. Cal. 2007) (granting partial summary judgment in favor of *plaintiff* based on 54 calls over a six-month period, including a day in which six calls were made) with Tucker v. CBE Grp, Inc., 710 F. Supp. 2d 1301, 1305 (M.D. Fla. 2010) (granting summary judgment to *defendant* based on 57 calls, including 7 in one day).

### D. Negligence Claim

Plaintiff's negligence claims is based upon Saxon's alleged failure to provide him with a permanent HAMP modification. More specifically, he alleges Saxon failed to timely review his 2009 HAMP loan modification and that its failure was caused by inadequate staffing and an ineffectual document collection system.

Most courts that have considered the issue, including several in Tennessee, have concluded that HAMP does not provide for a private right of action. See, Sinclair v. Citi Mortg., Inc. 519 F. App'x 737, 739 (3rd Cir. 2013); Wigod v. Wells Fargo Bank, N.A., 673 F.3d 547, 559 n.4 (7th Cir.2012); Grona v. CitiMortgage, Inc., 2012 WL 1108117, at *5 (M.D. Tenn. Apr. 2, 2012); Clay v. First Horizon Home Loan Corp., 392 S.W.3d 72, 79 (Tenn. Ct. App. 2012). True enough, "a violation of federal law can support a state law claim, even when—or, perhaps, especially when—there is no private right of action under a federal statute." Mik v. Federal Home Loan Mortg. Corp., 743 F.3d 149, 166 (6th Cir. 2014). However, Tennessee courts routinely hold that alleged negligence in the handling of a loan modification does not does not state a viable cause of action. See Williams v. SunTrust Mortg., Inc., 2013 WL 1209623, at *3–4 (E.D. Tenn. Mar. 25, 2013)

Grona, 2012 WL 1108117, at *3–4. This includes "allegations of negligent implementation of HAMP," Clay, 392 S.W.3d at 75, because the terms of HAMP do not impose a special duty on mortgage owners and servicers with respect to borrowers seeking to modify their mortgage loan under HAMP." Federal Nat. Mortg. Ass'n v. Carr, 2013 WL 5755083, at *4 (M.D. Tenn. Oct. 23, 2013).

In response to Saxon's Motion for Summary Judgment, Plaintiff claims that it "will show that Saxon failed to properly staff, train and manage its employees," such that documents were lost or misplaced, and "urge[s] the Court to observe that Saxon entered into a Consent Order with the Federal Reserve which addresses the claims of negligence made by Plaintiff." (Docket No. 91-1 at 23). The Court "need not discuss the substance of the Consent Order beyond noting that [Plaintiff is] not a party to it. Put simply, 'borrowers are not third-party beneficiaries of agreements between mortgage lenders and the government.'" Wilson v. HSBC Mortg. Serv. Inc., 744 F.3d 1, 16 (1st Cir. 2014) (citation omitted); see also, S.E.C. v. Dollar General Corp., 378 F. App'x 511, 514 (6th Cir. 2010) ("The Supreme Court has held, however, that 'a well-settled line of authority . . . establishes that a consent decree is not enforceable directly or in collateral proceedings by those who are not parties to it even though they were intended to be benefitted by it.'") (citation omitted). Summary judgment is appropriate on Plaintiff's negligence claim.

**E.  TCPA Claim**

For similar reasons, summary judgment is appropriate on Plaintiff's TCPA claim. That claim, like the others, is grounded upon the foreclosure proceedings (or threat thereof) and the handling of his loan modification.

"The TCPA was enacted to provide statutory remedies beyond common-law fraud actions

for consumers and legitimate business enterprises victimized by unfair or deceptive business acts or practices that were committed in Tennessee in whole or in part." SecurAmerica Bus. Credit v. Schledwitz, 2014 WL 1266121, at *23 (Tenn. Ct. App. Mar. 28, 2014). "Moreover, the TCPA is explicitly remedial and Tennessee courts are therefore required to construe it liberally to protect consumers in Tennessee and elsewhere." Tucker v. Sierra Builders, 180 S.W.3d 109, 115 (Tenn. Ct. App. 2005). Though remedial and liberally construed, however, the TCPA is not without its limits and, in the words of the Tennessee Supreme Court, "does not extend to every action of every business in the state of Tennessee." Pursell v. First American National Bank, 937 S.W.2d 838, 941 (Tenn. 1996).

Pursell involved a dispute between a borrower, and a bank and its repossession company after the borrower failed to make payments on his truck. Recognizing that the TCPA contains a "trade, commerce or consumer transaction" component, the Tennessee Supreme Court held that the borrower did not state a cognizable claim under the statute because "the actions of the Bank and its agent, even if considered to be unfair and deceptive, did not did not affect the 'advertising, offering for sale, lease or rental, or distribution of any goods, services, or property, tangible or intangible, real, personal, or mixed, and other articles, commodities, or things of value wherever situated.'" Id. (quoting Tenn. Code Ann. § 47-18-103(9)).

Based primarily upon Pursell, Tennessee courts, both state and federal, have held that the TCPA does not apply to allegedly deceptive conduct in foreclosure proceedings. See, Dauenhauer, 2013 WL 2359602, at *9 (stating that it is settled law in Tennessee that allegedly deceptive acts in foreclosure proceedings are not within the ambit of the TCPA); Malone v. U.S. Bank Nat'l Ass'n, 2013 WL 392487, *5 (W.D. Tenn. Jan. 30, 2013); Pugh v. Bank of Am., 2013 WL 3349649, at *7

(W.D. Tenn. July 2013) ("the TCPA does not apply to foreclosure proceedings"); <u>Flynn v. GMAC Mortg., LLC</u>, 2011 WL 4708858, at *2–3 (E.D. Tenn. Oct. 4, 2011) (dismissing the plaintiff's TCPA claim because "the TCPA does not apply to repossession and collateral disposition activities by creditors, including foreclosure activities"); <u>Paczko v. Suntrust Mtg., Inc.</u>, 2012 WL 4450896, at *2 (Tenn. Ct. App. Sept. 25, 2012) ("the TCPA does not apply to allegedly deceptive conduct in foreclosure proceedings").

Recognizing as much, Plaintiff argues that his TCPA claim should not be dismissed because his loan "has not been foreclosed and his claim is focused on Saxon's activities in processing the attempted and failed HAMP loan modification and making representations which it did not keep and had no intent to keep." (Docket No. 91-1). However, "courts applying Tennessee law have consistently held that a lenders' actions relating to foreclosure and debt collection, even when pursuing loan modification, are not covered by the TCPA." <u>Brooks v. Wells Fargo Bank, N.A.</u>, 2014 WL 345737, at *6 (M.D. Tenn. Jan. 30, 2014) (collecting cases). Moreover, as Judge Campbell observed in <u>Silvestro v. Bank of Am., N.A.</u>, "the TCPA itself provides that it is . . . not applicable to 'credit terms of a transaction.'" 2013 WL 1149301, at *5 (M.D. Tenn. Mar. 19, 2013) (quoting Tenn. Code Ann. § 47-18-111(a)(3)). "[R]enegotiation of a loan – that is, a loan modification application – involves the credit terms of a transaction and, therefore, the TCPA does not apply." <u>Id</u>.; <u>see also Amour</u>, 2013 WL 6497821, at *5 ( "Although Plaintiffs argue their claim is not targeted at the foreclosure but rather at the modification process, courts have held that the TCPA is also inapplicable to loan modification proceedings because they deal with 'credit terms of a transaction' specifically exempted from the TCPA's coverage").

**F.  Emotional Distress Damages**

Saxon moves for summary judgment on Plaintiff's emotional distress claim, arguing that Plaintiff cannot show "outrageous conduct" to support such an award. However, his request for punitive damages is not based solely upon the intentional infliction of emotional distress, but upon the alleged violation of his substantive rights. "The FDCPA also allows a plaintiff to recover 'any actual damage sustained' as a result of a violation of the statute," and this "include[s] damages for emotional distress." Minnifield v. Johnson & Freedman, LLC, 448 F. App'x 914, 916 (11th Cir. 2011); see also Sewell v. Allied Interstate, Inc., 2011 WL 32209, at * 4 (E.D. Tenn. Jan. 5, 2011).

Based upon the testimony of Plaintiff's psychiatrist Dr. Stephen Moore, Saxon also argues that Plaintiff's anxiety "was caused by factors **other than** Saxon's alleged wrongful conduct, such as his existing anxiety, sexual dysfunction, family history of anxiety, and admitted stress in other areas of his life, including his employment and generally poor financial condition." (Docket No. 74-2 at 35) (emphasis in original). While Dr. Moore did testify about those conditions and concerns, he also stated that, during the sessions, Plaintiff also complained about Saxon's allegedly harassing telephone calls. Besides, "[a]n injured person's testimony alone may be sufficient to establish damages for emotional distress, provided that the plaintiff explains the circumstances giving rise to the injury." Hoffman v. GC Serv. Ltd., 2010 WL 9113645, at * 18-19 (E.D. Tenn. Mar. 3, 2010). It will be for the jury to determine whether Plaintiff can establish that some of his emotional distress claims arose from Saxon's conduct, assuming that he presents enough evidence to survive a directed verdict on that issue.

## G.  Punitive Damages

Saxon is entitled to summary judgment on Plaintiff's request for punitive damages because his sole remaining cause of action is under the FDCPA. That Act allows a prevailing plaintiff to

recover "any actual damage sustained by such person as a result" of a violation.  15 U.S.C. §

1692k(1)(1).  This does not include punitive damages.  Thomas v. Law Firm of Simpson & Cyback,

244 F. App'x 741, 7443 (7th Cir. 2007); Young. v. LVNV Funding, LLC, 2013 WL 4551722, at *2

(E.D. Mo. Aug. 28, 2013);  Desmond v. Phillips & Cohen Assocs., Ltd., 724 F. Supp.2d 562, 563

n.1 (W.D. Pa. 2010);  see also Randolph v. IMBS, Inc., 368 F.3d 726, 728 (7th Cir. 2004)

("violations of the FDCPA generally lead to small penalties and never to punitive damages");

Beaudry v. Telecheck Serv., Inc., 2010 WL 2901781, at *4 (M.D. Tenn. July 20, 2010) ("Unlike the

FDCPA, the FCRA allows the recovery of punitive damages for willful violations").

## H.  Credit Damages

Finally, summary judgment is warranted on Plaintiff's request for loss of credit damages

because his remaining claim is based primarily upon the repeated contact he received from Saxon,

and that contact could not have affected his credit rating.  Moreover, Saxon's reporting accurately

reflected the status of Plaintiff's loan as delinquent and in foreclosure, and Plaintiff does not dispute

that during the term of the trial plan Saxon was authorized to report the loan as delinquent.

## III.  OCWEN'S MOTION FOR SUMMARY JUDGMENT

More than a year after this case was filed, Plaintiff amended his complaint to add Ocwen as

a Defendant.  The Amended Complaint alleges that, "[o]n or around February 3, 2012, Plaintiff

received a letter from Shapiro and Kirsch, LLP indicating that the law firm now represents Ocwen

Loan Servicing, LLC."  (Docket No. 30, Amended Complaint ¶ 44).  Plaintiff claims the letter "was

an attempt to collect a debt" that violated the FDCPA because "Shapiro and Kirsch acting as the

attorney for Ocwen knew or should have known that Plaintiff was represented" by counsel.  (Id.).

Plaintiff also alleges that prior to the Shapiro and Kirsch letter, he did not receive either a welcome

letter or validation of debt letter and that Ocwen failed to notify him of its servicing responsibilities and duties in violation of both the FDCPA and RESPA. (Id. ¶ 45). Receipt of the letter, Plaintiff claims, has "caused more mental stress . . . and has aggravated and made worse the emotional distress" he already suffered as a result of Saxon's alleged misdeeds. (Id. ¶ 46).

In moving for summary judgment, Ocwen argues that "all of Plaintiff's claims, which rely solely on Shapiro and Kirsch's February 1, 2012 letter, fail because Ocwen was not the loan servicer when Shapiro and Kirsch sent the letter to Plaintiff," and, in fact, "Ocwen did not become the loan servicer until over two months later, on April 16, 2012." (Docket No. 70 at 2). As a consequence, Ocwen argues, it could not have authorized Shapiro and Kirsch to send the letter, and cannot be responsible to Plaintiff for violations of the FDCPA and/or RESPA.

Ocwen relies extensively on an Affidavit of Crystal Kearse. In the Affidavit, Ms. Kearse, "a Loan Analyst at Ocwen Loan Servicing," states:

2. Plaintiff Ronald Jestes' loan servicing was transferred from Saxon to Ocwen on or around April 16, 2012.

3. Ocwen did not service Mr. Jestes' loan in February 2012.

4. Ocwen did not instruct or authorize Shapiro & Kirsch to send the February 1, 2012 letter attached as Exhibit C to the Amended Complaint of [sic] this matter, or any other document, on its behalf.

5. Ocwen could not have authorized Shapiro & Kirsch to send the February 2, 2012 letter on its behalf because Ocwen had not yet retained Shapiro & Kirsch to act as its attorney with respect to Plaintiff's loan on February 2, 2012.

6. On February 9, 2012, Ocwen advised Shapiro & Kirsch that Mr. Jestes' loan servicing had not transferred as of February 1, 2012.

7. On March 27, 2013, Plaintiff was sent a Notice of Servicing Transfer.

8. On April 20, 2012, Ocwen sent Plaintiff a validation of debt letter.

(Docket No. 87 at 1-2) (citation to attachments omitted).

The statements in Ms. Kearse's affidavit (most particularly those in paragraphs 2-5) are about as conclusory as they can be. Ultimate or conclusory facts are insufficient to either support or contest a motion for summary judgment. See, L.F.P.IP, LLC v. Hustler Cincinnati, Inc., 533 F. App'x 615, 620-21 (6th Cir. 2013); Alexander v. CareSource, Inc., 576 F.3d 551, 560 (6th Cir. 2009).


Further, while Ms. Kearse is a "Loan Analyst" and begins by stating that the affidavit is "true and accurate based on my own personal information," (Docket No. 87 at 1), she never explains how she knows for a fact that Ocwen did not service the loan in February 2012 and thus could not have authorized Shapiro and Kirsch to send the letter. Rule 56 of the Federal Rules of Civil Procedure specifically requires that an affidavit "used to support or oppose a motion must be made on personal knowledge, set out fact that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters therein." Fed. R. Civ. P. 56(c)(4). The affidavit parrots Ocwen's position without eestablishing as a fact that Shapiro and Kirsch did not have authority to act on its behalf when it sent the letter to Plaintiff.

True, Ms. Kearse attached several documents to her Affidavit which purport to show that Plaintiff's loan was not transferred prior to the time Shapiro and Kirsch sent the letter. One such document, which Ocwen appears to think is dispositive, is a "Notice of Servicing Transfer" from Saxon to Plaintiff. Although the Notice, begins with the line, "[e]ffective 4/16/2012, Saxon Mortgage Services . . . will transfer the servicing of your account to Ocwen Loan Servicing," this hardly establishes that is in fact what occurred. This is particularly so since an email from Shapiro and Kirsch to Ocwen stated that Plaintiff's "loan service transferred from Saxon to Ocwen effective

24

2/1/2010." (Docket No. 87-1). Even though Ocwen responded to the email by writing, the "loan transfer to [O]wcen from Saxon is postponed to 03/01/2012," id., all this does is throw but another date into the mix, albeit one which would have been after the Shapiro & Kirsch letter, assuming that is when the actual transfer occurred.

"The party requesting summary judgment bears an initial burden of demonstrating that no genuine issue of material fact exists, which it must discharge by producing evidence to demonstrate the absence of a genuine issue of material fact or 'by showing . . . that there is an absence of evidence to support the nonmoving party's case.'" Canady v. Gillette Co., 547 F. App'x 670, 677 -78 (6th Cir. 2013) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323–25 (1986)). Ocwen has not carried that burden in relation to establishing when the loan was transferred, or that it began servicing the loan after Shapiro and Kirsch sent the letter. Moreover, Plaintiff alleges that Shapiro and Kirsch was acting with apparent authority in sending the February 1, 2012 letter, and "questions of apparent authority are questions of fact and are therefore for the jury to determine." Gunkel v. Secure One, Inc., 2006 WL 3524479, at *3 (E.D. Tenn. Dec. 6, 2006); see also Central States Southeast and Sw. Pension Fund v. Kraftco, Inc., 799 F.3d 1098, 1113 (6th Cir. 1986) ("'A finding that one person is another's agent is generally reviewed as a question of fact [and] the nature and extent of the agent's authority and whether apparent authority existed are also questions of fact.'") (citation omitted).

As an alternative to outright dismissal of Plaintiff's FDCPA and RESPA claims, Ocwen requests summary judgment on Plaintiff's request for emotional distress damages. That request will be granted.

As already noted, emotional distress damages are recoverable for FDCPA violations.

Further, upon proper proof, a plaintiff may recover emotional distress damages for a violation of RESPA. Houston v. U.S. Bank Home Mortg. Wisconsin Servicing, 505 F. App'x 543, 548 (6th Cir. 2012). The quantum of proof necessary to establish such emotional distress claims appears to be an open question in the Sixth Circuit.

In Houston, the Sixth Circuit merely stated that it found "nothing in the text" of RESPA "to preclude 'actual damages from including emotional damages, provided that they are adequately proven," id. at 548 n.6, while the Eleventh Circuit in McClean v. GMAC Mortg. Co., 398 F. App'x 467, 471 (11th Cir. 2010), stated that to recover emotional damages under RESPA plaintiff must "present specific evidence to establish a causal link between the financing institution's violation and their injuries . . . which must be sufficiently articulated; neither conclusory statements that the plaintiff suffered emotional distress nor the mere fact that a . . . violation occurred supports an award for compensatory damages." See also Catalan v. GMAC Mortg. Corp., 629 F.3d 676, 698 ((7th Cir. 2011) (to recover emotional distress damages under RESPA plaintiffs must "describe their emotional turmoil in reasonable detail, and explain[] what they believe to be the source of the turmoil").

In Hoffman v. GC Serv. Ltd., 2010 WL 9113645, at * 18-19 (E.D. Tenn. Mar. 3, 2010), Judge Phillips of the Eastern District of Tennessee noted that there was a split in the lower courts over whether a plaintiff had to meet state law standards for the intentional or negligent infliction of emotional distress in order to recover emotional damages under the FDCPA, but opted not to impose state law requirements. Instead, relying upon the legislative history of the FDCPA and the Sixth Circuit's decision in Bach v. First Union Nat'l Bank, 149 F. App'x 354, 361-62 (6th Cir. 2005), which addressed emotional distress damages under the analogous Fair Credit Reporting Act, Judge

Phillips found that "[t]o obtain emotional damages under the FDCPA, the plaintiff must provide actual evidence of distress and injury, not merely conclusory statements."  Hoffman, 2010 WL 9113645, at *19.  That is, "[a]n injured person's testimony alone may be sufficient to establish damages for emotional distress, provided that the plaintiff explains the circumstances giving rise to the injury."  Id.

Whatever the standard, Plaintiff has failed to establish a triable issue on his emotional damages claim against Ocwen.  In response to Ocwen's Motion for Summary Judgment, Plaintiff argues that "[c]ourts have held that expert testimony is not required to prove actual damages in a negligence or FDCPA case for emotional distress[,] Bynum v Cavalry Portfolio Servs., L.L.C., 2006 WL 1047035 (N.D. Okla. 2006)[,] but Plaintiff would have support for his emotional damages in this case beyond his own testimony through Dr. Moore."  (Docket No. 88 at 7).  He also argues that, "[c]ontrary to Ocwen's assertion, Plaintiff has testified that Ocwen has caused him emotional distress," and cites for that proposition pages 28 through 32 of his deposition, reiterating that his emotional distress is "supported by Dr. Moore's testimony that plaintiff is suffering from an anxiety disorder."  (Id. at 7-8).

Reliance upon Dr. Moore's testimony gets Plaintiff nowhere on his emotional distress claim against Ocwen because Dr. Moore testified that the last time he saw Plaintiff was on February 22, 2012, and Dr. Moore did not state that Plaintiff related any interaction with Ocwen as a cause for concern and anxiety.  Regardless, in his deposition Plaintiff stated: "I wouldn't say that Ocwen has caused me a lot of emotional distress in particular.  I haven't had much contact with Ocwen."  (Docket No. 70-1, Jestes Dep. at 30).  He testified further that, after Ocwen began servicing his loan, his alleged stress level "stayed about the same." (Id. at 29).  When asked to explain how Ocwen has

caused him emotional distress damages, Plaintiff stated "I'm – not right now.  I'm not – I would just have to refer to my attorney again to explain that part of it." (Id. at 48). This is simply insufficient to present a jury question on whether Ocwen's extremely limited contact was a factor in Plaintiff' alleged emotional distress.

## IV.  CONCLUSION

On the basis of the foregoing, both of Defendants' Motions for Summary Judgment will be granted in part and denied in part.  An appropriate Order will be entered.


KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE